**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
JEFFREY EDWARDS,

                     Plaintiff,

             - against -

THE TOWN OF HUNTINGTON; THE TOWN
HUNTINGTON DEPARTMENT OF GENERAL
SERVICES; BOB PECKHAM (in his Official and
Individual Capacity); and RICHARD SMOSKY
(in his Official and Individual Capacity),

                     Defendants.
--------------------------------------------------------X

**REPORT &
RECOMMENDATION**

CV 05-339 (NGG) (AKT)

**A. KATHLEEN TOMLINSON,** **Magistrate Judge:**

**I.** **PRELIMINARY STATEMENT**

      This action was commenced by Jeffrey Edwards (hereinafter "Plaintiff" or "Edwards") an

African-American who has been employed for nearly 20 years by Defendant Town of

Huntington. *See* Compl. ¶¶ 10-11. Plaintiff brings claims pursuant to 42 U.S.C. §§ 1981 and

1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq.*, New York State

Executive Law § 290 *et seq.* and § 296(6). *See* Compl. ¶¶ 28-43. Plaintiff asserts four causes of

action, the first and second of which allege that the Town of Huntington, the Town's Department

of General Services, Bob Peckham and Richard Smosky violated Title VII and the New York

State Human Rights Law (hereinafter the "NYSHRL") by subjecting the Plaintiff to a hostile

work environment and adverse employment action based on his race. Plaintiff also asserts a

claim of retaliation based on his opposition to Defendants' discriminatory practices. The third

cause of action charges that the Defendants, in violation of 42 U.S.C. § 1983, engaged in a

pattern or practice of discrimination which was "so persistent and widespread that they [*sic*]

constitute the constructive acquiescence of policy makers." The fourth claim alleges that such

"unlawful discrimination and retaliation have violated Plaintiff's federally protected rights under

color of state law, in violation of 42 U.S.C. § 1981." Compl. ¶¶ 28-43.

Defendants the Town of Huntington ("Town"), the Town of Huntington, Department of

General Services ( "DGS"), Bob Peckham ("Peckham") and Richard Smosky ("Smosky") move

for summary judgment seeking dismissal of Plaintiff's Complaint.[1]

After thoroughly reviewing the parties' submissions and having heard oral argument on

the motions, it is my recommendation that Defendants' motions be GRANTED in part and

DENIED in part for the reasons set forth below.

## II.   FACTUAL BACKGROUND

As an initial matter, I note that the facts set forth in Plaintiff's Rule 56.1 Statement stand

in contradiction to those given at Plaintiff's deposition.  The Second Circuit has held that the

"purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by

freeing district courts from the need to hunt through voluminous records without guidance from

the parties."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) (citing *Monahan v.*

*New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)).  "A Local Rule 56.1

---

[1]     At the September 25, 2006 oral argument, Plaintiff agreed on the record to withdraw his
claims against Defendants Bob Peckham and Richard Smosky in their official capacities.  *See*
Transcript of Oral Argument at 5-6 (hereinafter cited as "Tr. at ___.") In my September 25, 2006
Civil Conference Minute Order, I directed counsel to file a Stipulation via ECF memorializing
the withdrawal of these claims as soon as possible.  To date, the parties have not filed the
Stipulation.  Nonetheless, I recommend to Judge Garaufis that the claims brought against
Defendants Peckham and Smosky in their official capacities be deemed withdrawn.  Those
claims will not be discussed in this Report and Recommendation.

statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Id.* "Where the record does not support the assertions in a Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently." *Id.* (citing *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 47 (2d Cir. 1985)). Therefore, in light of the foregoing, for the purposes of reciting the factual background of this action, all relevant citations will be made to the sworn testimony provided by the parties including Plaintiff's deposition testimony, and not to the conflicting Rule 56.1 Statements.

Plaintiff, an African-American male, commenced his employment with the Defendant Town of Huntington in or around September 1986. *See* Compl. ¶¶ 10-11. Plaintiff currently works in the Town's Department of General Services ("DGS") as a "Grade 13 Carpenter." *See* Compl. ¶ 11. At times relevant to this Complaint, Defendants Bob Peckham and Richard Smosky were Plaintiff's supervisors. *See* Compl. ¶¶ 8-9. Plaintiff has alleged that both Defendants Peckham and Smosky were responsible for "the hiring, firing, promotion and discipline of employees and all other employment related issues" and that both Defendants are "policymakers" for the Town and the DGS. *See id.*

Plaintiff alleges that "throughout January 1, 2003 to December 5, 2003" Defendant Peckham "made offensive racial comments in the presence of [Plaintiff] and other employees." *See* Compl. ¶ 12. Plaintiff delineates specific instances of comments and conduct which he contends subjected him to a "hostile work environment." *See* Compl. ¶¶ 12-15. He alleges that "prior to December 2003, Plaintiff complained about the discriminatory comments made by Peckham to Smosky" who offered to move Plaintiff to another department which, according to Plaintiff, would have essentially resulted in a demotion. *See* Compl. ¶¶ 16-17.

According to Plaintiff, adverse employment actions have been taken against him since he first reported the incidents to Smosky. *See* Compl. ¶ 12. Plaintiff cites to several examples of what he perceives to be retaliatory action on the part of the Defendants. For example, Plaintiff alleges that "within the last two years" the Town and DGS implemented a "computerized sign making system." Compl. ¶ 18. Plaintiff alleges that prior to the implementation of this computerized system, he "performed the job of sign maker." Compl. ¶ 18. However, since implementation of the computerized sign making system, Smosky has "not offered to train plaintiff in any of the processes utilized in the making of signs, whereas, employees similarly situated outside of Plaintiff's protected class have been trained." *See* Compl. ¶ 19. In addition, Plaintiff states that he was required to provide a doctor's note each time he was absent while white employees were not required to do so. Affidavit of Jeffrey Edwards ¶ 2.[2] Plaintiff further states that his work was subject to greater scrutiny than white employees and that he was not provided with the same equipment and tools as white employees. Edwards Aff. ¶ 5.

In December 2003, Plaintiff filed an internal grievance because he was not given the opportunity to learn the computerized sign making system and was therefore, "denied the opportunity to work "out of class as a Grade 14, Sign Painter." Compl. ¶ 20. Plaintiff alleges that working "out of class" would have enabled him to earn more money per hour. *See id.* Plaintiff alleges that "from the time the computerized sign making system was implemented until present, the computerized sign making work was handled by a foreman, and similarly situated White employees with less seniority and qualifications than Edwards." Compl. ¶ 21.

---

[2] All references hereinafter cited as "Edwards Aff. ¶ __."

On April 1, 2004, the Town and DGS issued a "Step II Grievance Decision" to respond to Plaintiff's allegations of racial discrimination and retaliation. *See* Ex. A, Affidavit of Lisa Baisley.[3] The "Step II Grievance Decision" states that "it is the position of the Department of General Services that operating the computer to make the decals for signs is not the work of a Grade 14, Sign Painter. Because of the location of the computer and the expense of training additional personnel, the operation for the computerized system has been assigned to the supervisor, Richard Smosky." *Id.* Nonetheless, under the "Step II Grievance Decision," "the parties agreed that Mr. Edwards would be paid as a Grade 14, Sign Painter each time he used the router to make a sign and that he would be paid for the time it took t [*sic*] complete the entire sign." *Id.*

Despite the issuance of the "Step II Grievance Decision," Plaintiff alleges that he was not permitted to make signs using the computerized system since only white workers were making signs with it. *See id.* Additionally, Plaintiff adds that he had little opportunity to work outside of his class as a "Grade 14 Sign Painter" and on several different occasions, Defendant Smosky prevented him from making signs. *Id.* In support of this last allegation, Plaintiff cites to a May 15, 2004 incident in which a white employee was "permitted to make a sign that Plaintiff should have made, and should have been paid for." Compl. ¶ 22. Additionally, Plaintiff posits that he has not been able to work "out of class as foreman, whereas, similarly situated white co-workers are given the opportunity to work out of class at a higher title, such a Labor Crew Leader I or Foreman I, for a higher pay rate." Compl. ¶ 23. Plaintiff states that he "previously applied for a

---

[3] All references hereinafter cited as "Baisley Aff. ¶ ___."

foreman and a foreman II position within the Recycling Department, but has been denied these positions in favor of White employees with less seniority and/or experience." Edwards Aff. ¶ 2.

In support of the motion for summary judgment, the Town has offered the Affidavits of Lisa Baisley, Personnel Officer for the Town, and Thomas Cavanagh, Director of DGS, who offer very different versions of the details concerning these positions. On December 28, 2002, three foremen retired from DGS. Baisley Aff. ¶ 5; Affidavit of Thomas Cavanagh ¶ 3.[4] On June 5, 2003, the Town posted a notice for a "Labor Crew Leader (foreman) II position" with the Department of General Services which eleven individuals applied for, not including the Plaintiff who, Baisley states did not apply for the position in June 2003." Baisley Aff. ¶¶ 6-9; Cavanagh Aff. ¶ 6. Defendant Peckham was selected for the position of Labor Crew Leader II and promoted to that position on July 28, 2003. Baisley Aff. ¶ 9; Cavanagh Aff. ¶ 7.

Baisley states that on February 20, 2004, the Town posted a notice for a "Labor Crew Leader I" position within the Department of Environmental Waste Management. Baisley Aff. ¶ 10. Eleven individuals again applied for the position but the Plaintiff did not. Baisley Aff. ¶¶ 11-12. Sean Cavanagh was selected for the position and assumed the position of "Labor Crew Leader I" on April 17, 2004. Baisley Aff. ¶¶ 13-14.

In April 2005, the Town posted a notice for three available "Labor Crew Leader I" positions within the DGS. Baisley Aff. ¶ 15; Cavanagh Aff. ¶ 11. Twenty-eight individuals applied for these positions, including the Plaintiff. Baisley Aff. ¶ 16; Cavanagh Aff. ¶ 11. According to Cavanagh, who as Director of the DGS made the ultimate hiring decisions, "one of the Labor Crew Leader positions posted in April 2005 was for a foreman position at Crab

---

[4]     All references hereinafter cited as "Cavanagh Aff. ¶ ___."

Meadow Golf Course" and this position "required specialized knowledge regarding golf course care and maintenance, as well as knowledge relating to organic maintenance." Cavanagh Aff. ¶¶ 12-13.  According to Cavanagh, "only one of the applicants for the Labor Crew Leader I positions possessed the requisite knowledge and experience for the position at the Crab Meadow Golf Course."  Cavanagh Aff. ¶ 14.  Plaintiff was not that person.

Cavanagh states that he selected the Labor Crew Leader I positions "based upon their skills and abilities, relevant experience, and training."  Cavanagh Aff. ¶¶ 15-19.  Ultimately, the three Labor Crew Leader positions were filled by two Caucasians and one African-American. Baisley Aff. ¶ 17.  Plaintiff argues that Defendants have failed to promote him on the basis of his race while other, similarly situated white employees, have been promoted.  Compl. ¶ 24. Additionally, Plaintiff alleges that "white employees are repeatedly offered promotions, training, and opportunities to work out of class for higher rates of pay, however, plaintiff has been prevented from same, either on a temporary or permanent basis."  Compl. ¶ 26.

Finally, Plaintiff alleges that the discriminatory employment practices utilized by the Town and the DGS "evidence the fact that the defendants have engaged in a pattern and practice of discrimination on the basis of race/color, and in retaliation against Plaintiff for his participation in protected activities."  Compl. ¶ 27.  According to Cavanagh, the first time Plaintiff stated that "Peckham had been making inappropriate racial comments to him" was when Plaintiff submitted his grievance on December 5, 2004 concerning his denial of the opportunity to make signs using the computerized sign making system.  Cavanagh Aff. ¶¶ 20-21.

**III.** **STANDARD OF REVIEW**

**A.** **SUMMARY JUDGMENT**

In reviewing a motion for summary judgment, the Court is guided by the tenets set forth

in Rule 56(c) which provides as follows:

> . . . The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the moving party is
> entitled to judgment as a matter of law. . . .

Fed. R. Civ. P. 56 (c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d

Cir. 2006); *Gray v. Lutheran Social Services of Metropolitan New York, Inc.*, No. 04-CV-2843,

2006 WL 1982859, at * 3 (E.D.N.Y. July 13, 2006). The moving party bears the burden of

meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In

addition, to determine whether the moving party has satisfied this burden, the Court is required to

view the evidence and all factual inferences arising from that evidence in the light most favorable

to the non-moving party. *Id.* at 157; *Fischl v. Armitage*, 128 F.3d 50 (2d Cir. 1997); *Brown v.

Parkchester South Condominiums, Inc.*, No. 00-CV-7235, 2006 WL 851789, at *5 (S.D.N.Y.

Mar. 31, 2006). "Even where facts are disputed, in order to defeat summary judgment, the

nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its

favor." *Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001). Summary

judgment is mandated if the non-moving party fails to make a showing sufficient to establish the

existence of an element essential to that party's case and on which that party will bear the burden

of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

As the Second Circuit has noted, although [w]e are particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question[,] ... even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). However, the Second Circuit has held that "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact." *See Schaino v. Quality Payroll Systems, Inc*., 445 F.3d 597, 603 (2d Cir. 2006). The Second Circuit has also held that "it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Therefore, in order to successfully withstand a motion for summary judgment in an employment discrimination case, the evidence in the record must be admissible and sufficient to support a reasonable inference that more likely than not, unlawful discrimination was the motivation behind the adverse employment action. *James v. New York Racing Ass'n*, 233 F.3d 149, 152 (2d Cir. 2000); *Goenaga v. March of Dimes Birth Defects Found*., 51 F.2d 14, 18 (2d Cir. 1995).

## IV.   DISCUSSION

Title VII forbids an employer from intentionally discriminating against an employee because of that employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Additionally, Title VII also makes it unlawful for an employer to "discriminate against any of his employees ... because he has made a charge, testified assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A violation of Title VII can be shown by either direct, statistical or circumstantial evidence. *See, e.g., Luciano v. Olsten Corp.*, 110 F.3d 210, 215-16 (2d Cir. 1997).

In order to establish a claim of racial discrimination under Title VII, Plaintiff must set forth a *prima facie* case by showing that he (1) belonged to a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003); *Mandell v. County of Suffolk*, 316 F.3d 369, 377 (2d Cir. 2003). The Second Circuit has stated that a plaintiff can establish that such an inference is warranted by providing support for the contention that his employer "treated [him] less favorably than a similarly situated employee outside the protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Absent direct evidence, a Plaintiff's employment discrimination claims are subject to the three-step burden-shifting *McDonnell Douglas* framework outlined by the Supreme Court to analyze Title VII claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). The employee bears the initial burden of producing evidence sufficient to support a *prima facie* case of discrimination [or retaliation]." *Id.* As the Second Circuit has noted, "[a] Plaintiff's

establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination"

which then "shifts the burden of production to the defendant, who must proffer a 'legitimate,

nondiscriminatory reason' for the challenged employment action." *Cross v. New York City*

*Transit Authority*, 417 F.3d 241, 248 (2d Cir. 2005) (quoting *Woodman v. WWOR-TV, Inc.*, 411

F.2d 69, 76 (2d Cir. 2001)).

      Once an employer offers such proof, the presumption of retaliation dissipates and the

employee must show that retaliation was a substantial reason for the adverse employment action.

*See Jute v. Hamilton Sundstrandt Corp.,* 420 F.3d 166, 173 (2d Cir. 2005). At that point, the

plaintiff must then prove that a defendant's proffered reasons were not the true reasons for its

actions but a pretext for discrimination." *Cross*, 417 F.3d at 248 (quoting *Roge v. NYP Holdings,*

*Inc*. 257 F.3d 164, 168 (2d Cir. 2001)). "The ultimate burden of persuading the trier of fact that

the defendant intentionally discriminated against the plaintiff remains at all times with the

plaintiff." *Texas Dep't of Cmty. Affairs, v. Burdine*, 450 U.S. 249, 252-54 (1981); *Schnabel v.*

*Abramson*, 232 F.3d 83, 87 (2d Cir. 2000). As Judge Leval has observed,

> . . . once the employer has proffered a reason for its action, all
> presumptions and special rules drop away; a case under Title VII
> becomes like any other case in that the plaintiff, in order to prevail,
> must have evidence from which the factfinder can reasonably find
> the essential elements of the claim.

*James v. New York Racing Ass'n*, 233 F.3d at 154.

      The burden of proof that must be met to establish a *prima facie* case of discrimination has

been characterized by the Second Circuit as "minimal" or "de minimis." *See McGuinness v.*

*Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *Zimmerman v. Assocs. First Capital Corp.*, 251

F.3d 376, 381 (2d Cir. 2001); *James*, 233 F.3d at 153-54*; Schnabel*, 232 F.3d at 87; *Abreu v.*

*Suffolk County Police Dept.*, No. 03-CV-5927, 2007 WL 608331, at *7 (E.D.N.Y. Feb. 23, 2007). However, the Court is required to disregard allegations which are purely conclusory and devoid of concrete particulars. *Brown v. Parkchester South Condominiums, Inc.*, No. 00-CV-7235, 2006 WL 851789, at *1 (S.D.N.Y., March 31, 2006) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 2003)).

A.    HOSTILE WORK ENVIRONMENT

Section 1981 provides a cause of action for race-based employment discrimination premised on a hostile work environment. *See Whidbee v. Garzarelli Food Specialities, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (citing *Lopez v. S.B. Thomas, Inc.*, 831 F.3d 1184, 1189 (2d Cir. 1987)). It is well settled that the respective burdens of proof and persuasion of the parties in a Title VII action ... apply equally to a § 1981 action." *Harvey v. NYRAC, Inc.*, 813 F. Supp. 206, 209 (E.D.N.Y. 1993) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)).

To prevail on a hostile work environment claim, a plaintiff must demonstrate: (1) that his work place was "permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment" and "(2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996). In showing that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, several factors are considered. *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004). These factors include "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Id.* at 150.

### 1.    COMMENTS BASED ON RACE

The Second Circuit has held that "as a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). As the Supreme Court has held "mere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed. 295, 298 (1993). "Incidents that are 'few in number' and that occur 'over a short period of time' may fail to demonstrate a hostile work environment." *Whidbee*, 223 F.3d at 69.

Plaintiff argues that Peckham made offensive racial comments to him during work which were "severe and/or pervasive." Compl. ¶¶ 12-14; Edwards Aff. ¶ 9. Plaintiff stated in his deposition that the following comments were made by Peckham between 1995 and 2003:

- ▸ In December 2003, Peckham "joked" with Plaintiff that "whites work better than blacks."

- ▸ Peckham referred to African-Americans as "spear chuckers."

- ▸ While Plaintiff was making a sign, Peckham pointed to the black letters on the white sign and said, "he should be happy because it's the only time black is in top of white."

- ▸ Peckham told Plaintiff that he was "the first black man to ride in a Town truck with him."

- ▸ Peckham made stereotypical remarks about African-Americans eating "chicken, watermelon, and spare ribs."

- ▸ Peckham asked Plaintiff if he wanted to have a job in front of his house holding a lantern.

- ▸ Following the Martin Luther King, Jr. Day holiday, Peckham stated "hey guys, did you thank Jeff for the Martin Luther King Day weekend?"

- ▸ Peckham told Plaintiff "you people always need to depend on us" in reference to an African-American worker who borrowed money from a Caucasian employee.

Edwards Dep. Tr. at 137-146.

In addition, in his Complaint, Plaintiff makes several other material allegations of hostile work environment which, for the purposes of this motion, the Court must accept as true:

- ▸ During the Abner Louima scandal, Joe Rech, a high level Foreman, painted the top of a plunger red to simulate blood, and proudly displayed the plunger on top of his desk for all employees to see.

- ▸ Various supervisors and employees made comments about a town truck which was labeled "White Truck." Upon information and belief, a white employee at a lower work grade then [*sic*] Plaintiff was permitted to drive this truck, whereas, plaintiff was not permitted.

- ▸ Steve Muller, a temporary employee of Huntington, said to Plaintiff, words to the effect of, "Fuck you and your race."

- ▸ Richard Smosky ("Smosky"), one of Plaintiff's supervisors, called Juan Gonzalez ("Gonzalez"), a Huntington employee, a dumb Puerto Rican, and a "spic." Smosky, also referred to the manner in which Gonzalez spoke as "spanglish."

- ▸ Smosky told Gonzalez that he should be fired, and words to the effect of, 'I am bringing in whites in [*sic*] who do a better job."

- ▸ Smosky said that Puerto Ricans were not allowed in his office.

- ▸ A group of white employees referred to Felix Clemente, a Huntington employee, as a "chili picker."

- ▸ Carl Cavanaugh, Deputy Director of the highway department, had a magnetic board on which black dots represented black employees.

14

Compl. ¶ 14.

In his deposition, Bob Peckham stated that all racial comments were made in jest with Plaintiff actively partaking in the discussion.  For example, Peckham states "I would joke around with him.  But, you know, comments about his race or anything, I think was only maybe three, four, five times a year.  That's all."  Peckham Tr. at 13.  In his deposition, Edwards described his relationship with Peckham as follows:

Q:     Is it fair to say during the period of time that he [Peckham] teased you?

A:     Yeah, I guess so.

Q:     And is it fair to say that you teased him?

A:     Well – yeah, I guess maybe.

Q:     Back and forth as coworkers; is that correct?

A:     Right.

Q:     And sometimes his comments to you had a racial tone to it; is that correct?

A:     Right.

Q:     And is it fair to say sometimes your comments to him had a racial tone?

A:     No.

Q:     Never?

A:     No, I wouldn't talk like that, no.

Edwards Tr. at 131.

Edwards characterized his relationship with Peckham as a "regular work relationship." Edwards Tr. at 130.  According to Edwards, "we weren't rude to each other.  I wouldn't say he was a friend."  *Id.*  According to Cavanagh, the first time Plaintiff informed him that Peckham

had been making inappropriate racial comments to him was on December 5, 2003 when Plaintiff

submitted a grievance complaining that he was being denied the opportunity to make signs using

the computerized sign making system. Cavanagh Aff. ¶¶ 20-21. At his deposition, Plaintiff

testified about this decision. For example,

> A:  I remember saying something to [Peckham] about the fact
> that – you know, about war, that we would be fighting. If
> I had to write a grievance, I was going to be putting everything
> in as I did that I could remember. I was really just annoyed with
> trying to get the position.

Edwards Tr. at 138.

*       *       *

> A:  Yeah, I said to [Smosky] then too. I think I had to quote that
> true enemy at war is war itself. I didn't want to write the
> grievance, but it didn't seem like it was getting me anywhere
> and I was going to write a grievance and detail everything that I
> could remember.
>
> Q:  And when you say you would detail everything?
>
> A:  I mean the racial issues and expressed that to him clearly.
>
> Q:  And you told him that you were upset by the racial issues?
>
> A:  Yeah, he knew I was upset. He got more agitated than I did. As I was
> trying to speak to him, he started yelling at me. So I just said, listen,
> you know what, if you are telling me I have no choice but to write a
> grievance, that's what I'll do and that's what I did.

Edwards Tr. at 150.

On December 11, 2003, Plaintiff's grievance was denied and Plaintiff then requested that

his grievance be considered under the Town's EEO complaint procedure. Cavanagh Aff. ¶¶ 22-

24. Thereafter, the Town's EEO Complaint Review Committee conducted an investigation and

16

found that Peckham had made "racially insensitive remarks" to Plaintiff in violation of the Town's EEO Policy. Cavanagh Aff. ¶¶ 25-27. Based on these findings, Cavanagh disciplined Peckham by requiring Peckham to forfeit four vacation days. Cavanagh Aff. ¶ 29. According to Cavanagh, Plaintiff did not challenge the EEO's findings through arbitration and did not file any further complaints about Peckham. Cavanagh Aff. ¶¶ 28, 30. Defendants argue that the incidents delineated by the Plaintiff were essentially jocular "stray remarks" since they "occurred over a period of several years" and thus, failed "to rise to the level of creating a hostile work environment as a matter of law." Defts.' Mem. at 17.

For comments to give rise to a hostile work environment claim, a plaintiff must show that such comments "permeated with discriminatory intimidation, ridicule, and insult that was so severe or pervasive as to alter the conditions of his employment." *Goldschmidt v. New York State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 312 (S.D.N.Y. 2005). Throughout his deposition, Plaintiff repeatedly could not recall when or how many times these comments were made. Edwards Tr. at 137-145. The Second Circuit has held "for racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1997). Nonetheless, "there is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir. 1999). Rather courts must "consider the totality of the circumstances." *See Harris*, 510 U.S. at 23, 114 S.Ct. at 371.

The cases on this issue have been broad in scope and diverse in circumstance. The Second Circuit has held a hostile work environment to exist where the plaintiffs were subjected to a stream of racially offensive comments over the span of two to three months. *See Whidbee*, 223 F.3d at 70. Other cases underscore that mere generalized allegations that racist remarks abound in the workplace will not provide a sufficient basis for proceeding to trial. *See, e.g., Mcpherson v. NYP Holdings, Inc.*, No. 03-CV-4517, 2005 WL 2129172, at *8 (E.D.N.Y. Sept. 1, 2005) (three comments made over a period of more than two years amount only to a few isolated incidents, and therefore do not constitute a hostile work environment); *Pagan v. N.Y. State Div. of Parole*, No. 98-CV-5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (four racial remarks within one year did not create a hostile work environment); *Dorrilus v. St. Rose's Home*, 234 F. Supp. 2d 326, 335 (S.D.N.Y. 2002) (employee calling plaintiff a racial slur four time within one month did not create a hostile work environment); *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (seven racial comments over three years did not create a hostile work environment even when plaintiff's supervisor called him an "uppity nigger" and "boy").

There is a divergence in the caselaw as to the nature and amount of derogatory or offensive comments sufficient to classify a work environment as hostile – what many decisions refer to as "stray remarks." The Second Circuit recently addressed this lack of clarity in *Tomassi v. Insignia Financial Group*, No. 05-CV-6219, 2007 WL 495314, *1 (2d Cir. Feb. 16, 2007). In *Tomassi*, the Second Circuit stated

> We recognize that our precedents may have been confusing.
> In some instances we have found the evidence legally
> insufficient notwithstanding the incidence of discriminatory
> remarks. To explain why the evidence was nonetheless

insufficient, we noted that the remarks were "stray." That locution represented an attempt--perhaps by oversimplified generalization--to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination. For example, remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark. (citations omitted)

The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be. (citations omitted)

Where we described remarks as "stray," for the purpose of doing so was to recognize that all comments pertaining to a protected class are not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not sufficient. We did not mean to suggest that remarks should be first categorized either as stray or not stray and then disregarded if they fall into the stray category.

*Tomassi*, 2007 WL 495314, *4.

"Whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997). In *Whidbee v. Garzarelli*, 223 F.2d 62, 67 (2d Cir. 2000), the Second Circuit vacated a grant of summary judgment in a hostile work environment case in which a supervisor declined to take any action upon being apprised of specific racist threats issued by a co-worker who stated that he "still can't stand black folk," referred to a black employee as a "lazy black snake" and threatened to use "a rope in the back shed to hang" a black employee. *Id.* at 66-67. The Second Circuit took particular note of at least one comment in which a co-worker said "he had a rope with which to hang a co-worker" and emphasized that it "was physically threatening." *Id.* To some extent, there appears to be an analogous circumstance in Plaintiff's allegation here that

"during the Abner Louima scandal, Joe Rech, a high level Foreman, painted the top of a plunger red to simulate blood, and proudly displayed the plunger on top of his desk for all employees to see." Compl. ¶ 14. Taking this allegation as true, which the Court is required to do on a motion for summary judgment, that particular occurrence, coupled with numerous derogatory racial comments made in the presence of other employees leads me to conclude that there are sufficient facts alleged which should be heard and determined by a jury. These factors warrant a denial of summary judgment on Plaintiff's hostile work environment claim.

The factors which go into making an assessment of a hostile work environment "must be evaluated both subjectively and objectively: a reasonable person would find the environment hostile or abusive and the victim did in fact perceive it to be so." *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 290 (S.D.N.Y. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Reasonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate." *Whidbee*, 223 F.2d at 71 (citing *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir. 1999).

Based on the totality of the circumstances outlined above, I find that there are genuine issues of material fact which preclude summary judgment on Plaintiff's hostile work environment claim. *Schiano v. Quality Payroll Systems*, 445 F.3d 597, 603 (2d Cir. 2006); *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997).

Plaintiff contends that at times relevant to his Complaint, Defendants Bob Peckham and Richard Smosky were his supervisors.  *See* Compl. ¶¶ 8-9.  Plaintiff has alleged that both Defendants Peckham and Smosky were responsible for "the hiring, firing, promotion and discipline of employees and all other employment related issues." *See id.*  Plaintiff further alleges that "Defendant Peckham was my direct supervisor" and "had control over my day-to-day job assignments, and would make or was involved in the decision to deny me out-of-class work." Edwards Aff. ¶ 7.  Plaintiff further states that "as a foreman/supervisor, Peckham also had the authority to discipline employees." *Id.*  However, during his deposition, Plaintiff acknowledged that Peckham did not have decisionmaking authority to remove work from him and give it to other employees. *See* Edwards Tr. 133-135.

In his affidavit in opposition to the summary judgment motions, Plaintiff states that "Defendant Smosky has input and influence in the hiring, firing, and promotion of Town employees.  Smosky also is a decision-maker with respect to the training of employees, the assignment of work (including out-of-class work), and the distribution of overtime."  Edwards Aff. ¶ 6.  In his affidavit, Richard Smosky, Town Parks Maintenance Supervisor, states that he has "no decisionmaking authority regarding the transfer, promotion, or disciplining of employees."  Affidavit of Richard Smosky ¶ 5.[5]  Smosky further states that "authority relating to personnel matters within the Department of General Services rests exclusively with the Director of the Department, Thomas Cavanagh.  *Id.* ¶ 6.  Smosky unequivocally states that he had "no involvement in any personnel decisions involving Jeffrey Edwards" and that he had "no

_____

[5]     All references hereinafter cited as "Smosky Aff. ¶ __."

involvement in any promotional decisions involving Jeffrey Edwards." *Id.* ¶¶ 7-8. However, Smosky's assertion is countered by Plaintiff's allegation that when Plaintiff complained about the discriminatory comments made by Peckham to Smosky, it was Smosky who offered to move Plaintiff to another department which, according to Plaintiff, would have essentially resulted in a demotion. *See* Compl. ¶¶ 16-17. Additionally, in his affidavit Plaintiff cites one occasion in which Smosky suspended him. *Id.* Perhaps most telling is Smosky's statement in his Reply Affidavit in which he states that one of his responsibilities is to "monitor and enforce" the Abusive Sick Policy for the "employees under my supervision." Smosky Reply Aff. ¶ 5. It is also worth noting that the "Step II Grievance Decision" states that "Because of the location of the computer and the expense of training additional personnel, the operation for the computerized system *has been assigned to supervisor, Richard Smosky*." Ex. 1, Baisley Reply Aff.

These statements are significant because they demonstrate the factual discrepancy here. Whether Peckham and Smosky were Plaintiff's supervisors is a genuine issue of material fact. Even where there is no formal "supervisor–employee" relationship, courts have found there to be a "question of fact" as to whether a purported supervisor exercised authority over a plaintiff tantamount to that of a supervisor's authority such that he could be considered a "de facto" supervisor. *See, e.g., DeWitt*, 48 F. Supp. 2d at 288; *see also Hernandez v. Jackson, Lewis, Schnitzer & Krupman*, 997 F. Supp. 412, 416 (S.D.N.Y. 1998) (whether defendant, who was not plaintiff's nominal supervisor, held the power to alter the terms and conditions of her employment presented a triable issue); *Gostanian v. Bendel*, No. 96-CV-1781, 1997 WL 214966, at *6 (S.D.N.Y. Apr. 25, 1997) (jury could reasonably find that defendant, not plaintiff's official supervisor, exercised de facto authority to affect the terms and conditions of plaintiff's

employment through her influence over plaintiff's supervisor); *Thomas v. Medco*, No. 95-CV-8401, 1998 WL 542321, at *10 (S.D.N.Y. Aug. 26, 1998) (a quid pro quo claim of harassment can rest on alleged harasser's authority to influence an adverse employment decision, if that influence is so significant that the harasser may be deemed the de facto decision maker). The same triable issue exists here.

In light of the conflicting sworn testimony presented, I find that the issue of whether Defendants Peckham and/or Smosky acted in a supervisory capacity is a material fact as to the hostile work environment issue, further warranting denial of the motions for summary judgment on this claim.

### B.    RETALIATION CLAIM

In order to establish a *prima facie* case of retaliation, a plaintiff must show "(1) that he engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-206 (2d Cir. 2006). The Supreme Court in *Burlington Northern* resolved a split among the circuits over what employer conduct was required to satisfy the second prong of a plaintiff's prima facie case of retaliation under Title VII. *See Burlington Northern & Santa Fe. Ry. v. White*, 126 S.Ct. 2405, 2410 (2006); *see also Kessler*, 461 F.3d 199, 206 (2d Cir. 2006). The Supreme Court in *Burlington Northern* announced a different standard than that which had been used by the Second Circuit previously. *See Kessler*, 461 F.3d at 206-08. The Supreme Court's decision in *Burlington* changed the traditional definition of adverse employment action and held that adverse employment actions are

"those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant," or those that would "likely have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S.Ct. at 2410. The Court specifically noted that the antiretaliation provision under Title VII prohibited a broader range of conduct that which is prohibited by the anti-discrimination provision. *See id.* at 2414. But, the Court also noted that the filing of a discrimination case "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415. Rather, the Court emphasized that an employee action must be materially adverse so as to separate significant and trivial harms. *See id.*

With respect to the third prong, proof of causation between the protected activity and the retaliation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)). As with other Title VII discrimination claims, if the plaintiff makes out a prima facie case of retaliation, it then falls to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

Construing Plaintiff's allegations in the light most favorable to Plaintiff, it is evident that Plaintiff engaged in a protected action by filing a grievance, which was subsequently denied, and then considered under the Town's EEO complaint procedure. Cavanagh Aff. ¶¶ 22-24.

Furthermore, it is uncontested that all parties involved were aware that Plaintiff was filing a grievance and participating in the Town's EEO appeal process. However, Plaintiff offers little substantive evidence that he suffered any adverse employment action as a result of the filing. As the Second Circuit has noted, although

> [w]e are particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question[,] ... even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.

*Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Therefore, in order to successfully withstand a motion for summary judgment in an employment discrimination case, the evidence in the record must be admissible and sufficient to support a reasonable inference that more likely than not, unlawful discrimination was the motivation behind the adverse employment action. *James v. New York Racing Ass'n*, 233 F.3d 149, 152 (2d Cir. 2000); *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.2d 14, 18 (2d Cir. 1995). Plaintiff contends that after filing his EEOC charge of discrimination, Defendants Peckham and Smosky over-scrutinized his work and job performance to a degree that similarly situated white employees did not experience. Edwards Aff. ¶¶ 4, 16. Plaintiff states that white employees were not consistently required to provide doctor's notes for their absences as he was and that white employees were afforded overtime and opportunities to perform out-of-class work that Plaintiff should have been permitted to do. Edwards Aff. ¶ 3. Defendants offer a non-discriminatory reason for this in the form of the Town's Abusive Sick Policy which is annexed to Smosky's Reply Affidavit. The Policy clearly requires all employees who exceed their two annual sick days to provide written justification for the absence. *See* Smosky Reply Aff., Exh. 1. In rebuttal to this assertion, Plaintiff states that the

treatment is disparate because other white employees who are on the list "were not consistently required to provide doctor's notes for their absences." Edwards Aff. ¶ 3.

Plaintiff also cites several other instances in which Plaintiff was told it was "time to get back to work" and that he was told he could not talk on his mobile phone during work hours. Edwards Tr. 109-118. Plaintiff admits at his deposition that in each instance, he was not disciplined. Edwards Tr. 110, 114.

Additionally, Plaintiff argues that he is not provided with the same equipment and tools provided to white employees and those employees who have not complained of discrimination. Edwards Aff. ¶ 5. Plaintiff also asserts that he had been denied "out-of-class work as an Acting Foreman" because he complained of discrimination. Edwards Aff. ¶ 15. Cavanagh offers race-neutral reasons for both assertions. According to Cavanagh, another carpenter is provided with a cellular telephone because he spends most of his time "out in the field rather than working in the shop, as Mr. Edwards does." Cavanagh Reply Aff. ¶¶ 8-12. Additionally, Cavanagh states that he selected another employee to work as "Acting Foreman (Lead Mason)" over Plaintiff because the selected person was a "trained mason" and Plaintiff was not qualified to do the work. Cavanagh Reply Aff. ¶¶ 5-7. Plaintiff asserted racial discrimination in more general terms as reflected in the following responses at his deposition:

> Q:     So can you identify for me any specific instances in which you
>        believe you were denied the opportunity to work as a grade 15
>        because of your race?
>
> A:     Again, I think I've said it over and over again that all of those situations
>        have to do with me, my race, me being denied out of class.
>
> Q:     But you can't identify for me any specific instances?
>
> A:     Not at this particular time.

26

Edwards Tr. at 108.

Courts in this district have found that to qualify as an adverse employment action, employer conduct must subject plaintiff to a "materially adverse change in the terms and conditions of [his] employment." *Medwid v. Baker*, 752 F. Supp. 125, 136 (S.D.N.Y. 1990). "Reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions." *Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006); *See, e.g., Stembridge v. City of New York,* 88 F.Supp.2d 276 (S.D.N.Y.2000) (no actionable harm where "reprimand contained a warning that repetition of improper behavior could result in disciplinary action but contained no indication of any planned discipline or further action"); *Nicastro v. Runyon,* 60 F.Supp.2d 181, 186 (S.D.N.Y.1999) (excessive scrutiny from supervisors and requiring documentation for sick leave could not support a Title VII retaliation claim); *Castro v. New York City Bd. of Educ. Personnel,* No. 96-CV-6314, 1998 WL 108004, *7 (S.D.N.Y. Mar.12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.''); *Henriquez v. Times Herald Record,* No. 97-CV-6176, 1997 WL 73244, *6 (S.D.N.Y. Nov. 25, 1997), *aff'd,* 165 F.3d 14 (2d Cir. 1998) (unfair criticism of plaintiff's performance was not the type of employment action that courts have found to be materially adverse). The alleged reprimands and close scrutiny at issue here likewise do not rise to the level of adverse employment action. Additionally, Plaintiff has failed to establish any causal connection between his EEO activity and Smosky or Peckham's alleged conduct.

However, certain conduct alleged by Plaintiff is not addressed at all by Defendants. For example, Plaintiff asserts (1) that he was criticized for taking a longer amount of time on certain signs while White employees were not (Edwards Aff. ¶ 4); (2) that Defendants provided a less senior employee with a $7,000 stipend for running a commercial driver's license training class while Plaintiff, who is more senior and has a commercial driver's license was not granted this position (Edwards Aff. ¶ 8);(3) that he was consistently not selected to serve as Acting Foreman while less senior White employees have been selected (Edwards Aff. ¶ 14); and (4) that he was less senior and less experienced White employees were provided training that Plaintiff was not provided (Edwards Aff. ¶ 20). Under the broader interpretation of the scope of activity which can constitute retaliation as recently enunciated by the Supreme Court in *Burlington Northern*, I find that all of these issues are not adequately addressed by the Defendants and raise genuine issues of fact for a jury which warrant the denial of summary judgment on Plaintiff's claim of retaliation.

### C. FAILURE TO PROMOTE

Courts in this Circuit have applied the same factors in analyzing claims of discrimination under Title VII, the New York Human Rights Law, and Sections 1981 and 1983. *See Rumala v. New York City Transit Auth.*, No. 02-CV-3828, 2005 WL 2076596, *1 (E.D.N.Y. 2005). To establish a prima facie claim based on an alleged discriminatory failure to promote, Plaintiff must produce evidence showing that (1) he is a member of a protected class; (2) he "applied and was qualified for a job for which the employer was seeking applicants"; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. *Brown v. Coach Store, Inc.*, 163 F.3d 706, 709-710 (2d Cir.

1998).   In *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court clarified that the *McDonnell Douglas* analysis describes an "appropriate model for a prima facie case of racial discrimination" but that the standard is not inflexible."  The Court also noted however, that in establishing a prima facie case the plaintiff must show that "she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."  *Id.* at 253, 101 S.Ct. 1089.  The Second Circuit has held that

> We read *McDonnell Douglas* and *Burdine* generally
> to require a plaintiff to allege that she or he applied
> for a specific position or positions and was rejected
> therefrom, rather than merely asserting that on several
> occasions she or he generally requested a promotion.
> This general mandate ensures that, at the very least, the
> plaintiff employee alleges a particular adverse employment
> action, an instance of alleged discrimination, by the
> employer. Moreover, we believe if generally requesting a
> promotion in an annual review were sufficient to establish
> a prima facie case, employers would be unfairly burdened
> in their promotion efforts.  Rather than simply, considering
> individuals who have specifically applied for a promotion,
> an employer would additionally have to keep track of all
> employees who have generally expressed an interest in
> promotion and consider each of them for any opening for
> which they are qualified but did not specifically apply.

*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998).

Plaintiff contends that the Town failed to promote him because of his race. Specifically, Plaintiff argues that Defendants have denied him promotions based on race while other, similarly situated white employees, have been promoted.  Compl. ¶ 24.  Additionally, Plaintiff alleges that "white employees are repeatedly offered promotions, training, and opportunities to work out of class for higher rates of pay, however, plaintiff has been prevented from same, either on a

29

temporary or permanent basis." Compl. ¶ 26. However, the sworn testimony of Baisley and Cavanagh make it appear that Plaintiff had applied for only one position which, based on Plaintiff's experience, he was not qualified to perform.

Both Baisley and Cavanagh have submitted sworn testimony stating that Plaintiff did not apply for the position of "Labor Crew Leader (foreman) II position" with DGS in June 2003, a position which was ultimately awarded to Peckham in July 2003. *See* Baisley Aff. ¶¶ 6-9; Cavanagh Aff. ¶ 6. Additionally, there is evidence in the record that Peckham was promoted and that the Town was not seeking to fill the "Labor Crew Leader II position" in June 2003. Cavanagh Aff. ¶ 8. As Cavanagh states, in June 2003 he "did not seek any additional applicants" nor did he "hire or promote any other employees to fill any of the foreman positions that were vacated by the retirements." *Id.* Plaintiff has offered no evidence to rebut this assertion. Consequently, Plaintiff's failure to promote claim as to this position must be dismissed since such a claim is not viable where defendant did not seek applicants to fill the position. *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

Plaintiff also did not apply for the "Labor Crew Leader I" position within the Department of Environmental Waste Management which was posted in February 2004. *See* Baisley Aff. ¶ 10. Plaintiff has not offered any evidence other than his perfunctory statements that he applied for these positions. Bald, conclusory allegations such as these which are unsupported by the evidence are insufficient to defeat a motion for summary judgment. *See Schwapp,* 118 F.3d at 111. Therefore, Plaintiff's failure to promote claim should be denied as to this position as well.

In April 2005, the Town posted a notice for three available "Labor Crew Leader I" positions within the Department of General Services. Baisley Aff. ¶ 15; Cavanagh Aff. ¶ 11.

Twenty-eight individuals applied for these positions, including the Plaintiff. Baisley Aff. ¶ 16; Cavanagh Aff. ¶ 11. According to Cavanagh, who as Director of DGS made the ultimate hiring decisions, "one of the Labor Crew Leader positions posted in April 2005 was for a foreman position at Crab Meadow Golf Course" which "required specialized knowledge regarding golf course care and maintenance, as well as knowledge relating to organic maintenance." Cavanagh Aff. ¶¶ 12-13. According to Cavanagh, "only one of the applicants for the Labor Crew Leader I positions possessed the requisite knowledge and experience for the position at the Crab Meadow Golf Course." Cavanagh Aff. ¶ 14. Cavanagh states that he selected the Labor Crew Leader I positions "based upon their skills and abilities, relevant experience, and training." Cavanagh Aff. ¶¶ 15-19.

Ultimately, the three Labor Crew Leader positions were filled by two Caucasians and one African-American. Baisley Aff. ¶ 17. Plaintiff maintains that he was denied the position based on his race. Edwards Aff. ¶ 13. Additionally, Plaintiff states that he formally applied for a "Labor Crew Leader II in the Department of Public Safety in March 1999" and a "Labor Crew Leader I position" in the DGS and was not hired for either position despite "greater seniority and qualifications." Edwards Resp. Aff. ¶¶ 3-4. According to Lisa Baisley, Edwards did not apply for either position. Baisley Supp. Aff. ¶¶ 8, 13. In his Responding Affidavit, Edwards states that "Lisa Baisley has a history of denying that minorities such as myself applied for positions, when in fact those individuals had applied for the positions in question. These individuals include Wellington Johnson, Roberta Saunders, and Brenda Witherspoon." Edwards Resp. Aff. ¶ 6.

In light of the conflicting sworn testimony provided as to these three positions, I find that there is an issue of fact as to whether Plaintiff applied for these three positions. Therefore,

Defendants' motion for summary judgment as to Plaintiff's failure to promote claim on these three positions must be denied.

### D. § 1983 CLAIMS

A "municipality cannot be held liable pursuant to Section 1983 solely because of the discriminatory actions of one of its employees." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004). To bring a successful claim under Section 1983, a plaintiff must show in the first instance that: '(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges.'" *Rumala*, 2005 WL 2076596, *8 (citing *Mack v. Port Auth.*, 225 F. Supp. 2d 376, 382 (S.D.N.Y. 2002)). Section 1983 does not provide a cause of action on the basis of *respondeat superior*. *See Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, "a municipal entity can only be held liable under § 1981 if the plaintiff 'can prove that the violation was committed pursuant to a 'policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officer." *Rumala*, 2005 WL 2076596, *9 (quoting *Monell*, 436 U.S. at 690). Similarly, a § 1983 claim against the Town or DGS is cognizable where the alleged constitutional violation by their employees resulted from either a government custom, policy, pattern or practice. *See Dean v. New York City Transit Auth.*, 297 F. Supp. 2d 549, 554 (E.D.N.Y. 2004) (citing *Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir. 1994)). Importantly,

> The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation ... So long as the discriminatory practices of city officials are persistent and widespread they could be so permanent and

> well settled as to constitute a custom or usage with the force of
> law, and thereby generate municipal liability.

*Sorlucco v. New York Police Department*, 971 F.2d 864, 870-1 (2d Cir. 1991). Nonetheless, "an

individual official's acts can rise to the level of 'policy' when 'senior personnel' knowingly

'acquiesce' in their subordinates' behavior." *Krulick v. Board of Educ. of New York City*, 781

F.2d 15, 23 (2d Cir. 1986) (citing *Turpin v. Mailet*, 619 F.2d 196, 203 (2d Cir. 1980)).

 Defendants argue that since Plaintiff has not produced any evidence that the Town had a

custom or policy of discriminating against African-American employees in the promotion

process, his claim under § 1981 must be dismissed. Defts.' Mem. at 13. In opposition, Plaintiff

argues that Peckham and Smosky's alleged acts of racial discrimination are sufficient to attach

liability not only to them, but to the Town and DGS. Pltf.'s Mem. at 20-24.

 The Plaintiff may establish a municipal policy or custom by proving that a final

policymaker engaged in racial discrimination. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483,

89 L.Ed.2d 452 (1986). Whether a particular official or officials have "final decison-making

authority" is a question of state law; the challenged action must have been taken pursuant to a

policy adopted by the official responsible under state law for making policy in that area of the

city's business." *Id.* at 482-83. "Municipal liability attaches only where the descionmaker

possesses final authority to establish municipal policy with respect to the action ordered. The

fact that a particular official – even a policymaking official – has discretion in the exercise of

particular functions does not, without more, give rise to municipal liability based on an exercise

of that discretion." *Pembaur*, 475 U.S. at 481-482. The rationale underlying this premise is that

"if the mere exercise of discretion by an employee could give rise to a constitutional violation,

the result would be indistinguishable from *respondeat superior* liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).

In giving an example of a final policymaker in *Pembaur*, the Supreme Court offered the following example:

> Thus, ... the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability... Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.

*Pembaur*, 475 U.S. at 484, n. 12.

In this Circuit, the plaintiff bears the burden of establishing as a matter of law that the conduct of a given official represents an official policy. *See Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000). After a careful review of the record, I find that Plaintiff has failed to establish that either Peckham or Smosky were final policymakers under New York Law. As set forth in his affidavit, Cavanagh, as Director of DGS, was the person with "authority over all personnel decisions affecting members... including such things as hiring, firing, promotions and transfers." Cavanagh Aff. ¶ 2. Additionally, there is evidence in the record that following Plaintiff's January 7, 2003 request that his grievance be considered under the Town's EEO complaint procedure, the Town's EEO Complaint Review Committee conducted a hearing and made a finding that Peckham had violated the Town's EEO Policy by making "racially insensitive remarks." Cavanagh Aff. ¶¶ 24-27. As a result, Cavanagh testified that Peckham was disciplined "by requiring that he forfeit four vacation days or face departmental challenges." Cavanagh Aff. ¶ 28. Thus, Plaintiff has offered no evidence that Peckham or Smosky were

responsible for making employment policy for the Town. Plaintiff has therefore failed to prove that the employment decisions were state action. Given these facts, I recommend that Defendants' motion for summary judgment as to plaintiff's Section 1983 claims be granted.

### E. NEW YORK STATE EXECUTIVE LAW § 296

Plaintiff alleges that Defendants' discriminatory actions violated New York State Executive Law § 290, *et seq*.,. Compl. ¶¶ 32-34. In addition, Plaintiff asserts a claim under New York State Executive Law § 296(6) alleging that "Defendants, Peckham and Smosky, aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct." Compl. ¶ 35.

NYSHRL § 296(6) provides:

> It shall be unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

N.Y. Exec. Law § 296(6) (McKinney's 2007). This provision has been interpreted to impose personal liability on an employee "who actually participates in the conduct giving rise to a discrimination claim." *Strodeur v. Computer Assocs. International, Inc.*, 995 F. Supp. 94, 104 (E.D.N.Y. 1998). Courts have repeatedly held that a plaintiff may maintain claims against an individual defendant for violations of the NYSHRL if the individual defendant participated in the conduct giving rise to the discrimination claim. *Persaud v. S. Axelrod Co.*, No. 95-CV-7849, 1996 WL 11197, at *3 (S.D.N.Y. Jan. 10, 1996); *Johnson v. A.P. Products, Ltd.*, 934 F. Supp. 625, 630 (S.D.N.Y. 1996).

Discrimination claims under the New York State Executive Law § 296 (the New York State Human Rights Law, hereafter referred to as the "NYSHRL") are analyzed identically to claims brought under Title VII. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 224 (2d Cir.

2005); *Banks v. Correctional Services Corp.*, No. 06-CV-3414, 2007 WL 575468 at * 4 (E.D.N.Y. Feb. 15, 2007); *Drummond v. IPC International, Inc.*, 400 F.Supp. 2d 521, 535-536 (E.D.N.Y. 2005). A district court "need not explicitly evaluate a plaintiff's NYSHRL claims where it has thoroughly analyzed the plaintiff's Title VII claims." *Drummond*, 400 F. Supp.2d at 536 (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 363, n.1 (2d Cir. 1999)). Since there is a question of fact as to the hostile work environment claim under Title VII precluding summary judgment then the same must hold true for Plaintiff's NYSHRL claims. Accordingly, I recommend that Defendants' motions as the NYSHRL claims be denied as well.

## V. CONCLUSION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 10 days of service and failure to file objections within this period waives the right to appeal. *See* 28 U.S.C. § 636(b)(1)(c) (2006); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir.), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996). Therefore, the parties are directed to file any written objections to this Report and Recommendation with Judge Garaufis not later than 10 days from the date of this Order.

**SO ORDERED.**

Dated: Central Islip, New York
       March 18, 2007

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge